# In the United States Court of Federal Claims

No. 13-1012C

(Filed Under Seal: April 9, 2014)
(Reissued: April 17, 2014)

| | |
|---|---|
| ************************************* ) | Post-award bid protest; small business |
| ) | set aside; lowest price technically |
| **HYPERION, INC.,** ) | acceptable procurement; limitation on |
| ) | subcontracting; FAR § 52.219-14(c); |
| **Plaintiff,** ) | required inclusion in proposals of |
| ) | analyses to establish the reasonableness |
| **v.** ) | of proposed subcontract prices; FAR |
| ) | § 15.404-3(b)(1)-(2); prejudice; |
| **UNITED STATES,** ) | equitable relief |
| ) | |
| **Defendant,** ) | |
| ) | |
| ************************************* | |

Cyrus E. Phillips IV, Albo & Oblon L.L.P., Arlington, Virginia, for plaintiff.

Ryan M. Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Assistant Attorney General, Bryant G. Snee, Acting Director, and Kirk T. Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Stephanie Magnell, Trial Attorney, U.S. Army Legal Services Agency, Fort Belvoir, Virginia.

## OPINION AND ORDER[1]

LETTOW, Judge.

This post-award bid protest concerns a contract awarded by the United States Army ("the Army" or "the government") to benefit the Jordanian Armed Forces by providing installation and infrastructure upgrades to fiber optic cable networks in the Hashemite Kingdom of Jordan ("Jordan"). The acquisition satisfies a Foreign Military Sales requirement. The procurement was a small business set-aside acquisition intended to result in the award of a single firm, fixed-

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions. The resulting redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]."

price contractual award to the lowest priced technically acceptable ("LPTA") proposal.  Four entities submitted offers, and, after entering into initial discussions with all offerors and receiving changes, the Army eventually determined that all four proposals were technically acceptable.  The Army then awarded the contract to the lowest priced proposal.  Hyperion's price was the highest of the four offerors.  Hyperion contends, however, that each of the other proposals were technically unacceptable for various reasons, and this protest focuses on that contention.

**FACTS**[2]

**A. Solicitation**

The solicitation at issue, Solicitation No. W15P7T-13-R-D002, AR 5-139,[3] called for proposals to install fiber optic cable for the Jordanian Armed Forces and the Royal Jordanian Air Force, AR 1-2.  According to the solicitation's accompanying Statement of Work, the Army has undertaken an ongoing effort to assist Jordan with "developing a fully integrated Jordan C4ISR[4] ("JC4ISR") capability."  AR 1-2.  The objective of this particular solicitation was to continue infrastructure upgrades to the existing system by undertaking the "installation, testing[,] and sustainment activities required for the JAF Fiber Optic-Last-mile and the Fiber Optic-Long-haul cable links."  *Id.*  The Statement of Work further provided that, "[t]o this end, the contractor shall provide [p]rogram and [e]ngineering management, systems engineering, integration, material procurement, installation, testing, and logistics – which shall include the training, maintenance, and, where applicable, transferable O[riginal ]E[quipment ]M[anufacturer] commercial warranties.  The contractor shall be responsible for the overall system design and installation."  AR 1-4.

---

[2]The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), and the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

[3]Citations to the administrative record refer to the record filed on January 23, 2014.  That record is paginated sequentially and also divided into tabs.  In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 5-139 refers to page 139, which is located in tab 5 of the record.

[4]C4ISR is an acronym that stands for "Command, Control, Communications, Computers, Intelligence, Surveillance, Reconnaissance."  AR 2-105.

2

The procurement process was strongly affected by the Army's decision to establish a small business set-aside, AR 5-139, under the LPTA regime, AR 5-141.  The non-price sub-factors were "technical" capability and "past performance." AR 2-105.  After the solicitation was issued, potential offerors asked a series of questions about the solicitation, and the questions and the Army's answers were published.  In pertinent part, the government clarified that (1) offerors were permitted to subcontract with Jordanian companies, AR 5-142, *see also* AR 5-149, and (2) the government would not permit price adjustments post-award to account for unexpected terrain encountered during excavation for installation of fiber optic cables, AR 5-145.

The solicitation stated that it would be governed by Federal Acquisition Regulations ("FAR"), 48 C.F.R. Part 12, Acquisition of Commercial Items, FAR §§ 12.000-.603.  *See* AR 5-141.  As relevant to this protest, the solicitation also incorporated FAR § 52.219-6, Notice of Total Small Business Set-Aside,[5] § 52.219-14, Limitations on Subcontracting,[6] and § 15.404-3(b), Subcontract Pricing Considerations.[7]  AR 5-177, 207.  In its "Instructions, Conditions, and Notices to Offerors," the solicitation provided that proposals were to contain three volumes: (1) a Technical Volume, fully describing the offeror's methods and approaches for satisfying the Statement of Work, (2) a Past Performance volume, and (3) a Price volume.  AR 5-204 to -05.  In describing the content to appear in the Past Performance volume, the solicitation stated:

> Due to the critical nature of this program as discussed in the Statement of Work (SOW) at Paragraphs 1.0 1 [–] Scope, and 1.1 – Background, it is imperative that any resultant contract be awarded to an offeror that can successfully meet the program[']s Period of Performance.  Therefore, offerors submitting proposals must provide verifiable supporting documentation that demonstrates that it (*and any participating primary subcontractors*) has successfully completed a previous fiber optics network installation and configuration of similar scope to this instant requirement.  This experience should include ALL of the following:
>
> a. At a minimum, two (2) or more successful Fiber Optic network installations in an operational, commercial[,] or government controlled network.

---

[5]Section 52.219-6 defines a small business concern as "a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on [g]overnment contracts, and qualified as a small business under the size standards in this solicitation." FAR § 52.219-6(a).

[6]Section 52.219-14 requires that "[b]y submission of an offer and execution of a contract, the [o]fferor/[c]ontractor agrees that in performance of the contract in the case of a contract for . . . [s]ervices (except construction) . . . [a]t least 50 percent of the costs of contract performance incurred for personnel shall be expended for employees of the concern." FAR § 52.219-14(c).

[7]Section 15.404-3(b) mandates that a prime contractor-offeror shall "[c]onduct appropri-ate cost or price analyses to establish the reasonableness of proposed subcontract prices . . . [and] [i]nclude the results of these analyses in the price proposal."  FAR § 15.404-3(b)(1)-(2).

b. Successful Fiber Optic network installation, test and customer turn-over meeting any of the following or similar standards . . . .
c. The prime offeror must demonstrate that it has current or recent (within 3 years) experience working in the Middle East or develop[ing] nations, and that projects were completed successfully.

Offerors shall submit a list of all [g]overnment contracts (prime & major subcontracts) in performance or awards for the last three (3) years, which are relevant to the efforts required by this solicitation.

Relevant efforts are defined as any contract requiring:

An understanding of (*first-hand or through subcontractors*) the required processes to be followed for obtaining Right of Way permi[ts] for trenching and civil works projects, and;

Successful Long-haul (LH) Networks installation, configuration, test[,] and training resulting in customer turn-over meeting commercial best practice/recommended standards . . . .

AR 5-205 (emphasis added). Offerors were also directed to "provide an outline of how the efforts required by the solicitation will be assigned for performance within the offeror[']s corporate entity and among the proposed subcontractors." AR 5-206.

A subsequent section of the solicitation addressed "Evaluation Factors for Award." AR 5-210. There, the solicitation explained that award of the contract would be governed solely by technical acceptability and price – the lowest priced technically acceptable proposal would receive the award. *Id.* Overall technical acceptability turned on the two non-price sub-factors: "technical" and "past performance." *Id.* An offeror had to receive a rating of "Acceptable" for both the "technical" and "past performance" sub-factors to be considered technically acceptable overall. *Id.* The "technical" factor focused on whether the proposal "clearly meets the minimum requirements of the solicitation." *Id.* Regarding past performance, an offeror could receive a rating of "Acceptable" for the past-performance factor if, "[b]ased on the offeror's performance record, the [g]overnment has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is unknown. In the context of acceptability/unacceptability, offeror[s] determined to have unknown past performance shall be considered acceptable." *Id.* The solicitation further explained that

[t]he Past Performance evaluation will assess the relative risks associated with an [o]fferor[']s likelihood of success in performing the solicitation's requirements as indicated by that [o]fferor[']s record of past performance for a period of three (3) years prior to the release of this solicitation. In this context, "[o]fferor" refers to the proposed prime contractor and all proposed major subcontractor[s]. A major subcontractor is defined as one who will be providing critical hardware/material or services and/or whose subcontract is for more than 20% of the total proposed price. In either case, the prime contractor and proposed major subcontractors will

be assessed individually[,] and the results will then be assessed in their totality to derive the [o]fferor[']s Past Performance rating."

AR 5-211.  Offerors' past performance would be evaluated according to data provided in the offerors' proposals and data "obtained from other sources."  *Id.*  Offerors were requested to include "all relevant past efforts."  *Id.*  The solicitation defined "relevant efforts" as encompassing:

> The prime offeror must demonstrate that it has current or recent (within 3[]years) experience working in the Middle East, or developing nations, and that said projects were completed successfully, and;
>
> Multiple successful fiber optic or similar system installations in an operational commercial or government controlled network, and;
>
> An understanding of (first-hand or through subcontractors) the required processes to be followed for obtaining [r]ight of [w]ay permits for trenching and civil works projects, and;
>
> Successful Long-haul (LH) Networks installation, configuration, test[,] and training resulting in customer turn-over meeting commercial best practice/recommended standards . . . .

AR 5-211 to -12.  This definition correlated to the prior definition that appears in the part of the solicitation entitled "Instructions, Conditions, and Notice to Offerors," *see* AR 5-205 to -06 (quoted *supra*, at 3-4), but also sets out additional criteria.

Regarding price, the solicitation stated that it was assumed that adequate competition would result, eliminating the need for certified cost or pricing data.  "Therefore, offeror proposed prices will ONLY be evaluated for price reasonableness in accordance with FAR [§] 15.404-1(b) as determined by the [c]ontracting [o]fficer.  The purpose of a price reasonableness review is to determine whether the prices offered are to[o] high.  Cost analysis, cost realism analysis, and/or price realism analysis will NOT be performed on offeror proposals."  AR 5-212 (emphasis in original).

### B. Evaluation of Offers

The Army received timely proposals from Hyperion, [*** "Offeror A"], [*** "Offeror B"], and Technical Communications Solutions Corporation ("TCSC").  *See* AR 10-1097.  All of the proposals were initially evaluated as technically unacceptable to varying degrees due to defects in the technical sub-factor, *see* AR 10-1101 to -05, although they all received a rating of "acceptable" for the past performance sub-factor from the outset, *see* AR 10-1096.  The Army undertook discussions with all four and gave each offeror an opportunity to cure their technical defects.  *See* AR 10-1101 to -05.  After discussions, all offerors submitted technically acceptable proposals.  TCSC submitted the lowest priced proposal, and it received the award.  *See* AR 31-2153 to -55.  Because Hyperion is attacking the technical acceptability of the three other

offerors' proposals, *see* Pl.'s Br. In Support of Mot. for Judgment on the Administrative Record ("Pl.'s Br.") at 28, ECF No. 18-2, the pertinent components of each proposal are relevant to a decision.

      *1. TCSC's proposal.*

      TCSC's initial proposal had one deficiency – it failed to address a requirement to provide GPS coordinates at 50 meter intervals for the installed cable route.  AR 28-2121.  TCSC stated it would comply with the requirement, and its final proposal was found to be technically acceptable.  AR 28-2122.

      TCSC's projected subcontractor was [***], a Jordanian telecommunications company.  Throughout its proposal, TCSC often refers to the "TCSC/[***] Team" making it difficult to discern which work TCSC planned to perform and which work [***] was to perform.  *See*, *e.g.*, AR 9-949 to -50 (referring to the "TCSC/[***] team" in explaining the trenching, installation, and testing work).  On the one hand, "[t]he Program Manager from TCSC will have the primary responsibility [to] interface [with] the U.S. [g]overnment program team[, and] TCSC will be responsible for all cost, schedule, technical and programmatic issues associated with the JC4ISR-SC-FO-LM program."  AR 9-929.  On the other hand, "[***]'s technical team in Jordan will be responsible for procurement, installation, testing, and support for the entire period of performance."  *Id.*  Hyperion contends that by subcontracting all of the fiber optic cable installation, TCSC's proposal, on its face, shows that it would not comply with the limitations on subcontracting incorporated into the solicitation, Pl.'s Br. at 14, and that TCSC failed to comply with the requirement to submit subcontract pricing considerations, *id.* at 18.

      TCSC's past performance was found to be acceptable by the Army.  Hyperion also contests this finding because TCSC itself purportedly had no experience installing fiber optic cables or any recent experience in the Middle East or a developing nation, which Hyperion asserts is a requirement of the solicitation.  Pl.'s Br. at 12-14.  TCSC provided four examples of similar efforts in which it had been involved, but the Army did not consider these examples because two examples were well outside the three-year window allowed by the solicitation for past performance efforts and the other two were of small dollar value and appeared to be unrelated to the work at issue in this solicitation.  AR 28-2128 to -29.  Accordingly, the Army did not consider any of the four examples and instead deemed TCSC's past performance to be "unknown" and therefore "Acceptable" by default.  AR 28-2129.  No past performance evaluations were submitted for TCSC's prime subcontractor.  [***], however, was known to the Army Security Assistance and Management Directorate-Project Management's Jordan team,[8] which considered it to be "fully capable of successfully performing the [fiber optic last-mile]

---

      [8]The Army's Security Assistance Management Directorate describes security assistance as "a group of programs, authorized by law, through which the US Department of Defense (DoD) or commercial contractors provide defense articles and services in support of national policies and objectives."  Security Assistance Management Directorate, https://samd.redstone .army.mil/ (last updated Apr. 7, 2014).

project." AR 28-2129. [***] had experience working in a prior phase of the JC4ISR upgrade program. *Id.*

TCSC's final proposed price was $8,622,068.00. AR 30-2149.

*2. [Offeror A]'s proposal.*

[Offeror A]'s initial proposal had five deficiencies in the technical sub-factor. AR 28-2112. First, [Offeror A] had conditioned its proposal on the assumption that only soil would be encountered during trenching, as contrasted to other materials, such as rock. *Id.* Second, it failed to state that it would provide GPS coordinates for each manhole location. *Id.* Third, [Offeror A] did not provide details regarding the dispersion range for the fiber cable. *Id.* Fourth, [Offeror A]'s proposal assumed the use of government drawings that the solicitation did not indicate were to be provided. *Id.* Fifth, [Offeror A]'s proposed schedule for delivering training materials was non-compliant with the requirements of the solicitation. *Id.* In its revised proposal, submitted July 31, 2013, [Offeror A] cured each of these deficiencies, and the technical evaluation team found the proposal to be technically acceptable. AR 28-2112 to -13. Hyperion contends that [Offeror A]'s final technical proposal continued to rest on the impermissible assumption that only soil would be encountered during cable installation. Pl.'s Br. at 21.

[Offeror A]'s projected main subcontractor was [***], AR 28-2125, and [***]'s Business Development Manager, [***], was the proposed project manager for this contract, AR 6-233. The Integrated Logistics Support Manager, Quality Assurance Manager, Field Operations Manager, and Leader of the technical teams were to report to the Project Manager, but the proposal was silent on whether those positions would be filled by [***] employees or [Offeror A] employees. *Id.* Field installation teams were to be comprised primarily of [***] technicians. AR 6-235, -242. Project oversight was to be provided by [Offeror A]'s President [***] and another person, [***]. AR 6-233. Hyperion argues that [Offeror A]'s proposal, on its face, shows that it would be unable to meet the limitation on subcontracting incorporated into the solicitation because [Offeror A] planned to subcontract the fiber optic cable installation in Jordan. Pl.'s Br. at 14-15. Hyperion also contends that [Offeror A] failed to comply with the requirement to submit subcontract pricing considerations. *Id.* at 18.

[Offeror A]'s past performance was found to be acceptable by the Army, AR 28-2125, and Hyperion does not contest that finding, *see* Pl.'s Br. at 12.

[Offeror A]'s final price was $[***]. AR 30-2149.

*3. [Offeror B]'s proposal.*

[Offeror B]'s initial proposal was found to have one deficiency – [Offeror B] had failed to state that it would provide the required training specifically for six students. AR 28-2115. Its amended proposal clarified that it would comply with all the training requirements. *Id.* Accordingly, [Offeror B]'s final proposal was determined to be technically acceptable. AR 28-2115 to -16. Hyperion maintains that [Offeror B]'s proposal is technically unacceptable in part because it conditioned its price on only encountering certain expected material during

excavation.  Pl.'s Br. at 22.

[Offeror B]'s projected major subcontractor was [***].  AR 18-1404.  [***] was to perform "all Jordan-based installation work including all trenching, laying, backfilling, manhole installation and construction, fiber installation and splicing, equipment, machinery, tools, and all coordination with the host nation of Jordan."  AR 18-1418.  [Offeror B] also planned to subcontract with [***] and [***].  *Id*.  [***] was to supply critical materials and organize the export shipping of all fiber reels from the manufacturer's plant in North Carolina to Jordan.  *Id*.  [***] was the optical fiber manufacturer and was also going to contribute to the training materials.  *Id.*  Hyperion asserts that [Offeror B]'s proposal, on its face, shows that it would be unable to abide by the limitation on subcontracting incorporated into the solicitation, Pl.'s Br. at 15, and that it failed to comply with the requirement to submit subcontract pricing considerations, *id*. at 18.

[Offeror B]'s past performance was found to be acceptable by the Army, AR 28-2126, and Hyperion does not contest that finding, *see* Pl.'s Br at 12.

[Offeror B]'s final proposal was $[***].  AR 30-2149.

*4. Hyperion's proposal.*

Hyperion's initial proposal had two deficiencies.  AR 28-2118.  First, Hyperion proposed to use internal company specifications for the required work instead of the commercial work performance standards cited in the solicitation.  *Id*.  Second, Hyperion did not include critical scheduling milestones in its draft Integrated Master Schedule.  *Id*.  Hyperion stated that it would meet the standards listed in the solicitation, and it amended the Integrated Master Schedule to include the missing milestones.  *Id*.  Thus, Hyperion's final proposal was found to be technically acceptable.  AR 28-2119.

Hyperion's projected major subcontractor was [***], a Jordanian company.  AR 25-1803.  [***] was going to manufacture and install the manholes and ducts to form the Manhole Duct System, while Hyperion was going to be responsible for the "installation, splicing[,] and termination and testing of the [f]iber [o]ptic [c]able."  AR 25-1817.  The Hyperion management team would be responsible for "[o]verall project management and interface with the US project management and contracting staff."  *Id*.  Hyperion contends that only an offeror who proposed to do at least some of the installation work in Jordan itself could possibly meet the limitations on subcontracting incorporated into the solicitation, and that Hyperion was the only offeror with such a proposal.  Pl.'s Br. at 16.

Hyperion's past performance was found to be acceptable by the Army.  AR 28-2127.  Hyperion's proposed final price was the highest at $[***].  AR 30-2149.

**C. Award and Protest**

The agency issued the award to TCSC on December 16, 2013, and Hyperion filed its protest in this court on December 23, 2013.  Compl. ¶ 1.  Hyperion was ostensibly fourth in line for the award because it submitted the highest price out of four technically acceptable proposals. Hyperion contends, however, that it was arbitrary and capricious for the Army to find the three other proposals to be technically acceptable.  Compl. ¶ 18.  In sum, as discussed above, Hyperion contends that all three offerors failed to meet the limitation-on-subcontracting provision and failed to include required subcontract pricing considerations.  Hyperion also argues that [Offeror A]'s and [Offeror B]'s final proposals still contained an impermissible price contingency related to material to be encountered during excavation.  Pl.'s Br. at 21-22.  Lastly, Hyperion contends that TCSC failed to meet the past performance requirements.  Pl.'s Br. at 12-14.

Hyperion argues that the court should terminate the Army's contract with TCSC. Hyperion further requests that the court specifically disallow the Army from (1) permitting [Offeror A] and [Offeror B] to resubmit price proposals that clarify the proposed division of labor between their own employees and their subcontractor's employees, Hr'g Tr. 18:6-10 (Mar. 12, 2014),[9] or (2), in the alternative, canceling the solicitation, Hr'g Tr. 19:2-7.  According to Hyperion, this would be a violation of FAR § 15.306(e)(1) because it would favor [Offeror A] and [Offeror B] over Hyperion.  Hr'g Tr. 18:9-10.[10]  It avers that only [Offeror A] and [Offeror B] would benefit from further discussions or re-solicitation, not Hyperion.  Hr'g Tr. 18:11-24.  In Hyperion's view, it was the only technically acceptable offeror and should have received the contract.  Hyperion's motion for judgment on the administrative record and the government's cross-motion have been fully briefed, and a hearing was held on March 12, 2014.

**Jurisdiction and Standing**

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)).  In pertinent part, the Tucker Act vests this court with jurisdiction to

> render judgment on an action by an *interested party* objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (emphasis added).  Thus, only an "interested party" has standing to challenge the award of a contract in a bid protest.  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the

---

[9]Further citations to the hearing held on March 12, 2014 will omit reference to the date.

[10]FAR 15.306(e) relates to exchanges with offerors after receipt of proposals, and provides in pertinent part that "[g]overnment personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another."

contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (internal citation omitted). A party can show the existence of a "direct economic interest" by demonstrating that it had a "substantial chance" of winning the award. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (internal citations omitted). "'[A] bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract.'" *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 107 (2013) (quoting *G4S Tech. CW LLC v. United States*, 109 Fed. Cl. 708, 719 (2013)).

The government argues that Hyperion lacks standing because it was fourth in line for the award, and it therefore cannot show that it had a "substantial chance" of winning the award. Def.'s Mot. to Dismiss, Opp'n to Pl.'s Mot. for Judgment on the Administrative Record, And Cross-Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 6, ECF No. 20. The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits, which is required for equitable relief, but avers that Hyperion falls short of alleging prejudice. *Id.* at 7-8. The court disagrees. Hyperion has adequately alleged that the government erred in its evaluation of each of the other three proposals and improperly found them to be technically acceptable. If the government indeed erred in the ways Hyperion alleges, Hyperion would have received the award but for the errors. The government's arguments to the contrary relate to the merits of Hyperion's contentions, and the court will treat them as such. *See* Hr'g Tr. 22:20-23. Hyperion has standing to pursue this protest.

## Standards for Decision

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's review of a challenge to an agency's contract award. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The court may set aside an agency's procurement decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to satisfying the criteria for equitable relief*, see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004). The court may find that an agency's decision was arbitrary, capricious, or an abuse of discretion, if it "lacked a rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The court may not "'substitute its judgment for that of the agency,'" *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent that it recognized the APA as an independent grant of subject matter jurisdiction)), and it must uphold an agency's decision against a challenge if the "contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal citations omitted). "[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (internal citation omitted).

# ANALYSIS

## A.  Limitation on Subcontracting

Hyperion argues that [Offeror A], [Offeror B], and TCSC submitted proposals that facially show they will be unable to comply with FAR § 52.219-14, "Limitations on Subcontracting," which was incorporated into the solicitation.  Pl.'s Br. at 14-15; *see also* AR 5-177.  FAR § 52.219-14 requires that offerors submitting a proposal in response to a solicitation designated as a small business set-aside agree that "[a]t least 50% of the cost of the contract performance incurred for personnel shall be expended for employees of the [small business]."  FAR § 52.219-14(c)(1).  Hyperion concludes that a proposal in response to this solicitation can *only* meet the requirement by self-performing at least some installation work in Jordan.  Pl.'s Br. at 16 ("[The solicitation] requires that eligible [o]fferors and proposed prime [c]ontractors deliver with their own forces in [Jordan] services required for Installation and for System Testing.").  Hyperion supports this conclusion by pointing to the Independent Government Cost Estimate, which estimated that of the services being delivered, [***]% must be delivered in-country – specifically, that Installation would constitute [***]% and System Testing would constitute [***]%.  Pl.'s Statement of Facts ¶¶ 20-21, ECF No. 18.

Hyperion correctly states, *see* Pl.'s Br. at 28-29, and the government acknowledges, that "a proposal that, on its face, leads an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation is technically unacceptable and may not form the basis for an award."  Def.'s Cross-Mot. at 13 (quoting *Centech Grp.*, 554 F.3d at 1038 (internal citations and quotations omitted)); *see also Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 526-28 (2005), *aff'd*, 163 Fed. Appx. 889 (Fed. Cir. 2006).  "A subcontracting limitation, including the [limitation-on-subcontracting] clause, is a material R[equest ] F[or ]P[roposal] term and a condition of a solicitation to which the offeror must agree in its proposal."  *Centech Grp.*, 554 F.3d at 1038.  In *Centech*, a contract awardee lost the award upon protest by another offeror because the awardee's proposal stated that it would incur only 43.2% of the contract's labor costs.  *Id.* at 1033.  The court noted that the pertinent question was not whether the awardee *could* comply with the limitation-on-subcontracting clause, but rather whether it *would* comply with the limitation.  *Id.* at 1040.  Similarly, in *Blount, Inc. v. United States*, 22 Cl. Ct. 221 (1990), the court held that the Bureau of Prisons properly declared Blount's proposal non-responsive because Blount proposed to perform only 10% of the work itself, rather than the 20% required by a Performance of Work clause in the solicitation for a construction contract.  22 Cl. Ct. at 228.[11]  The court explained that "a bid which takes exception

---

[11]Construction contracts typically require a lower percentage of self-performance than service contracts.  A twenty-percent self-performance requirement is not mandatory for a construction contract.  FAR § 52.219-14 has a specific subsection that addresses "[g]eneral construction," which provides that "[t]he [contracting small business] concern will perform work for *at least* 15 percent of the cost of the contract, not including the cost of materials, with its own employees."  FAR § 52.219-14(c)(3) (emphasis added).  Further, FAR § 52.236-1 provides a sample clause to govern "[p]erformance of [w]ork by the [c]ontractor" with a blank for the percentage to be inserted.  *Id.* (heading).  The instruction for use of the clause then obligates the procuring authority to "[c]omplete the clause by inserting the appropriate percentage consistent

to the self-performance requirement of the solicitation must be rejected as nonresponsive in order to prevent the bidder from achieving an unfair competitive advantage over other bidders and to ensure that the government evaluates all bids on an equal basis." *Id.* at 230.

The government seeks to distinguish *Centech Grp.* and *Blount* by arguing that in those instances, the awardees affirmatively represented that they would not comply with the self-performance requirements. Def.'s Cross-Mot. at 12-13, 29-30. In this case, the government argues, no offeror affirmatively represented that it would not comply, and in fact, by submitting proposals, all offerors agreed to comply. *Id.* at 13, 29.[12] Thus, as the government would have it, the proposals submitted by TCSC, [Offeror B], and [Offeror A] were not facially non-compliant, rendering adherence to FAR § 52.219-14 an issue of contract administration and not acceptability. Def.'s Cross-Mot. at 11. The government further contends that disputes over contract administration can only be brought pursuant to the Contract Disputes Act and fall outside the court's jurisdiction over this protest. Def.'s Cross-Mot. at 11-13.[13]

In short, the parties agree that the 50% self-performance requirement applies to this procurement, but they disagree over whether the Army could have reasonably concluded that the other three offerors' proposals demonstrated that they would comply with the self-performance requirements. As an initial matter, the court concurs with the government that the independent government cost estimate is not conclusive regarding the contract's division of labor, *see* Def.'s

---

with the complexity and magnitude of the work and customary or necessary specialty subcontracting (see [§] 36.501(a))." FAR § 52.236.-1

For construction contracts, FAR § 36.501(a) states that "[t]o assure adequate interest in and supervision of all work involved in larger projects, the contractor shall be required to perform a significant part of the contract work with its own forces."

[12]In *RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 261 (2009), the government made the opposite argument regarding an Air Force procurement. In *RhinoCorps*, the contracting officer decided not to limit a solicitation to small businesses after receiving responses to a sources-sought synopsis from two small businesses and determining that no small businesses could reasonably be expected to submit an acceptable offer. 87 Fed. Cl. at 268. The contracting officer made this determination after asking the two small businesses that responded to the sources-sought synopsis how they would comply with the 50% self-performance requirement. *Id.* at 269. The plaintiff argued that an inquiry into limitations on subcontracting was irrelevant at that stage of acquisition, *id.* at 274, but the government argued it was a material term of the request and that the Air Force could inquire into it as an issue of technical acceptability, *id.* at 277.

[13]In 2013, Congress added to the severity of sanctions imposed on disadvantaged small business contractors who violate a requirement specifying limitations on subcontracting. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, §§ 1651-52, 126 Stat. 2079-81 (Jan. 3, 2013). The new enactment codified the 50% subcontracting limitation on contracts for services, *see* 15 U.S.C. § 657s(a), and provided that either a fine of $500,000 or "the dollar amount expended, in excess of permitted levels, by the entity on subcontractors," whichever is greater, could be imposed. 15 U.S.C. § 645(g)(1).

Cross-Mot. at 30 n.8, and the court accordingly will focus on the proposals to determine whether they support a reasonable belief on the part of the government's procuring authority that the offerors would comply with the limitation on subcontracting.

TCSC's proposal, priced the lowest at $8,622,068.00, included a detailed price breakdown.  TCSC summarized its labor costs according to CLIN number, AR 26-2070, and provided a detailed classification of costs for the long-haul and last-mile trenching and laying, AR 26-2074 to -75.  The government argues that the spreadsheet summarizing labor costs according to CLIN number affirmatively demonstrates that TCSC would comply with the 50% self-performance requirement.  Def.'s Cross-Mot. at 29-30.  TCSC's total labor costs according to its labor summary per CLIN number were $[***].  *See* AR 26-2070.[14]  According to this spreadsheet, TCSC would self-perform at least [***]% of the labor costs, those for program management support and engineering and design.  Def.'s Cross-Mot. at 29-30.  Further inquiry into the spreadsheets underlying this summary, however, reveals an apparent mis-categorization of labor as a material cost.

The installation of the fiber optic cable in Jordan requires labor intensive trenching and laying of cable.  Nonetheless, TCSC's "labor" costs for trenching and laying the long-haul cable and the last-mile cable were only $[***] and $[***], respectively.  AR 26-2074 to -75.  These labor costs are suspiciously low. The same spreadsheets show "other material" costs listed under "material," contrasted to labor, which amount to $[***] for the last-mile trenching and laying and $[***] for the long-haul trenching and laying.  *Id.*  Immediately following these spreadsheets in TCSC's proposal, a descriptive "price analysis" appears for the "Labor" and "Material" costs. AR 26-2092.  One of these "Material" costs is "civil work," a cost associated only with long-haul and last-mile trenching and laying.  The proposal states:

> Civil work (1AD, 1AE): prices obtained through several quotations, we have reduced the risk significantly through a thorough survey and through experience we gained during accelerated[, *i.e.*, referring to a prior project].  We also conducted an independent audit on cost realism which proves that the job can be carried out for the prices we quoted.  Further we have kept a reserve in our fee for unforeseen contingencies.  These prices are competitive due to the current extra capacity in the market.

AR 26-2092.[15]  This commentary makes no sense unless "civil work" means labor.

This interpretation is supported and informed by other pricing spreadsheets included by TCSC in its proposal, which are particular to the costs for long-haul and last-mile trenching and laying.  TCSC states that it will pay its subcontractors $[***] and $[***] specifically for

---

[14]The spreadsheet that appears on AR 26-2070 accurately reflects the sum of the labor costs for each CLIN number as summarized on pages 2071 through 2080 of the administrative record.

[15]1AD and 1AE refer to the CLIN numbers associated with the last-mile and long-haul trenching and laying, respectively.  *See* AR 5-151 to -52.

excavation for the last-mile and long-haul trenching and laying, respectively.  AR 26-2081 to -91.  On these same spreadsheets, TCSC includes a separate cost for equipment and materials, leading the court to believe that the $[***] and $[***] figures are for subcontractor labor.  *See id.*  In short, TCSC's pricing spreadsheets reflect an inappropriate categorization of subcontractor labor costs as "material costs."  This miscategorization, intentional or not, is improper and should have led the Army to question TCSC's ability to comply with the limitation on subcontracting in this labor-intensive contract.  TCSC's labor costs for subcontractors are markedly higher than those it quoted, rendering it impossible for TCSC itself to provide 50% of overall labor costs.  It is readily apparent, on the face of TCSC's proposal, that it would not and could not comply with the limitations on subcontracting incorporated into the solicitation, and the Army should have found its proposal to be technically unacceptable.  *See Centech Grp.*, 554 F.3d at 1038.[16]

Like TCSC, [Offeror A] submitted a detailed price spreadsheet as part of its proposal.  *See* AR 23-1700 to -01.  [Offeror A] stated that [***] would be its major subcontractor for the project and that an [***] employee would be the Project Manager.  AR 6-233 to -242 (resume of proposed project manager, [***]).  The proposal also stated that the field installation teams would mostly be composed of [***] engineers and technicians.  AR 6-235.  The price spreadsheet submitted by [Offeror A] confirms that it proposed to spend $[***], on labor in total.  Of that total cost, $[***] was to be spent on "Labor in Jordan."  AR 23-1700.  The labor costs for the project manager and the labor costs associated with the physical trenching and laying, to be performed by [***] technicians and engineers, represented $[***].  *Id.*[17]  The remaining "Labor in Jordan" costs total $[***].  To meet the subcontracting limit, only an additional $[***] could be spent on subcontractor labor costs.[18]  The spreadsheet lists [***] other positions under the

---

[16]Because the court agrees with Hyperion that TCSC was not compliant with the solicitation due to its failure to adhere with the material requirement to self-perform 50% of the work, and that it was arbitrary and capricious for the Army to find otherwise, the court will not inquire into Hyperion's other contentions as to why TCSC's proposal was unacceptable, including whether it submitted sufficient detail about its subcontractor pricing or complied with a so-called "Definitive Responsibility" criterion Hyperion asserts exists in the proposal.  *See* Pl.'s Br. at 18, 28, 31.

In this latter respect, the court acknowledges the difficulty Hyperion might have faced in interpreting the language in the solicitation regarding whether evidence of "relevant efforts" was required to comply with solicitation requirements.  The solicitation used mandatory terms regarding the necessity of proof of prior success in similar projects, but the solicitation also states that that "unknown" past performance would necessarily be deemed "Acceptable."  *Compare* the "Instructions . . . to Offerors" quoted *supra,* at 3-4, *with* the past-performance evaluation criteria quoted *supra*, at 5.

[17]This amount includes the labor costs for the project manager, fiber placement technician, equipment operator, pipe placement technicians, field crew foreman, and guards.  AR 23-1700.

[18]To meet the limit on subcontracting, [Offeror A] could spend up to $[***] on subcontractor personnel costs, and $[***] minus $[***] equals $[***].

"Labor in Jordan" heading that are relevant to both program management and laying and trenching, but whose job descriptions are not provided, such as (1) a telecom engineer, (2) a transmission technician, (3) an accountant, (4) a draftsman, (5) a tea office boy, and (6) an executive office manager. *See* AR 6-233 to -35, AR 23-1700. Some of these positions represent significant labor costs. For example, the telecom engineer and the transmission technician combined represent $[***] in labor costs. AR 23-1700. The proposal does not indicate whether [Offeror A]'s employees, [***]'s employees, or a third-party's employees will fill these positions. [Offeror A] ambiguously states that "[i]nstallation and maintenance support will be at various identified locations within [Jordan]. . . . These activities will be managed by *our* staff at our offices in Amman." AR 6-258 (emphasis added). The court cannot determine which of these remaining positions would be filled by [Offeror A]'s employees, though compliance with the limitation on subcontracting mandates that at least some of these would be.

    The salient question in this respect is whether [Offeror A]'s proposal demonstrates that it would comply with the 50% self-performance requirement, not whether it could. It is numerically possible that [Offeror A] *could* comply, but it is very unlikely that nearly all of the remaining "Labor in Jordan" costs would be filled by as-yet unnamed [Offeror A] employees. *See Centech Grp.*, 554 F.3d at 1040 ("[T]he issue was not whether Centech *could* comply with the requirements of the [limitation-on-subcontracting] clause . . . [but] whether, in its proposal, Centech agreed that it *would* comply . . . ."). In *Chapman Law Firm*, the awardee of a small business set-aside contract failed to demonstrate a facial compliance with the incorporated limitation on subcontracting in its initial proposal. *Chapman Law Firm*, 63 Fed. Cl. at 527. The contracting agency initiated written discussions with the awardee, commenting on its relationship with a subcontractor to perform a significant portion of the work and inquiring into how the awardee intended to comply with the limitation-on-subcontracting requirement. *Id.* The awardee responded by (1) expressing its ability to comply with the 50% self-performance requirement, (2) providing job descriptions for seven of the awardee's own employees who would be working on the contract, (3) stating it would conduct quarterly audits to ensure compliance with the limitation on subcontracting, (4) clarifying the chain of command, and (5) limiting the tasks to be performed by the subcontractor. *Id.* Given this clarification by the awardee, the court found that the agency's determination that the awardee would comply with the limitation on subcontracting was not "irrational." *Id.* at 528. In this case, the Army did not engage in discussions with [Offeror A] regarding its ability to comply with the limitation on subcontracting despite the facial implausibility of its ability to comply, even though it engaged in discussions about other issues of technical compliance. Without further inquiry, it was unreasonable for the Army to believe that [Offeror A] would be able to comply with the limitation. *See Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 53-54, 57-58 (2005) (setting aside a contract award and holding that contracting officer did not have reasonable basis for determining that awardee would meet the limitation-on-subcontracting clause when awardee chose to subcontract most of the labor services needed to perform the contract and only reserved a few managerial positions of unspecified salary and duties for its own employees).

    [Offeror B] was the second-lowest bidder, with a final proposed price of $[***]. [Offeror B] wrote its proposal largely referring to itself as "[***]TEAM," describing a team comprised of [Offeror B] and its major subcontractor, [***]. *See, e.g.*, AR 7-473 to -77. [Offeror B] proposed to use [***] for "all Jordan-based installation work including all trenching, laying, backfilling,

manhole installation and construction, fiber installation and splicing, equipment, machinery, tools, and all coordination with the host nation of Jordan." AR 7-486. [Offeror B], however, also proposed to have at least [***] full-time [Offeror B] employees stationed in Jordan, including a project manager, [***]. *See* AR 7-483, -486.[19]  [Offeror B] provides little further detail regarding its pricing and how much of its proposal represents money being paid to the subcontractor. [Offeror B] estimated it would spend $[***] on program management and engineering and design combined. AR 24-1779 to -80. The description of these costs included the labor costs associated with the program manager, the field engineers/quality auditors, and documentation support. *Id.* For the trenching and laying of the long-haul and last-mile fiber optic cable, [Offeror B] estimated it would spend $[***]. AR 24-1777 to -78. Its description of the trenching and laying costs does not include any breakdown of labor versus material costs; nor does it include an indication of what tasks will be performed by [Offeror B]'s employees or [***]'s employees. Although [Offeror B] states that it will have a number of full time [Offeror B] employees dedicated to the project, unlike [Offeror A], it omits any information about whether those employees would constitute at least 50% of all personnel costs. Because subcontracting all or nearly all of the most labor intensive aspect of the contract, the trenching and laying, would likely render an offeror non-compliant with the limitation-on-subcontracting clause, the contracting officer had no reasonable basis to conclude that [Offeror B] would comply with the requirement. Overall, like [Offeror A]'s proposal, [Offeror B]'s proposal demonstrates a significant likelihood that it would not comply with the limitation on subcontracting, and it was irrational for the Army to find otherwise. *See Transatlantic Lines LLC*, 68 Fed. Cl. at 53-54, 57-58; *cf. Chapman Law Firm*, 63 Fed. Cl. at 527-28.

## B. Subcontract Pricing Considerations

Offerors were also to comply with FAR § 15.404-3(b), which was incorporated into the solicitation. *See* AR 5-207. In accordance with FAR Part 15.404-3(b), offerors were to "(1) [c]onduct appropriate cost or price analyses to establish the reasonableness of proposed subcontract prices [and] (2) [i]nclude the results of these analyses in the price proposal." FAR § 15.404-3(b).

Compliance with this requirement is at issue most strongly with the proposals submitted by [Offeror B] and [Offeror A]. Those proposals are indefinite and unspecific regarding pricing

---

[19][Offeror B]'s proposal did not unambiguously specify how many employees would be dedicated to the project. At one point, the proposal stated that acceptance inspections and tests "will involve our [***] [Offeror B] in-country [***], who will be pre-inspecting and auditing all activities." AR 7-479. [Offeror B]'s final price proposal, however, refers to [***]. AR 24-1779. [Offeror B] states elsewhere that its proposal "includes [***] full time equivalent employees dedicated to the program, including [***], and [***] that will perform testing, QA oversight, and logistics support." AR 7-486. There is an error in this sentence – either there are [***] full time employees, or one employee has two tasks, or the listing of the full time employees is misleading. The court will interpret the proposal in a light favorable to [Offeror B].

and allocation of work to subcontractors, as discussed previously regarding the showing made by those offerors respecting the limitation on subcontracting.

[Offeror A]'s proposal is notably opaque regarding which positions in Jordan will be filled by [Offeror A]'s employees and which will be filled by its subcontractor's employees. *See, e.g.*, AR 6-258.  [Offeror A]'s proposal does not include any separate reference to subcontracting costs or a price analysis establishing the reasonableness of those proposed prices. *See* AR 23-1700.  These omissions render its proposal non-compliant with FAR § 15.404-3(b) and thus technically unacceptable.  Accordingly, the court finds that the contracting officer could not have reasonably found [Offeror A]'s proposal to be technically compliant without further inquiry into the specifics of the subcontracting costs, and, relatedly, [Offeror A]'s ability to comply with the limitation-on-subcontracting provision.

Unlike [Offeror A], [Offeror B] included a Jordanian Subcontractor Comparison Summary in its proposal.  *See* AR 24-1726.  The chart includes subcontractor estimates it received to perform the last-mile and long-haul "[f]iber optic cable installation and infrastructure preparation including all work as required in the [Jordan Armed Forces Systems Requirement Document] and management supervision" from two companies, one of which was its chosen subcontractor, [***].  *Id.*  The total estimated price from [***] was $[***] and the total estimated price from the other company was $[***].  *Id.*  These estimates, however, do not correlate to [Offeror B]'s stated total in its proposal for the last-mile and long-haul trenching and laying, which it planned to subcontract to [***], because that total was $[***].  *See* AR 24-1777 to -78. In its proposal, [Offeror B] did not explain its subcontracting costs or the inconsistency between the Jordanian Subcontractor Comparison Summary table and the actual proposed price for trenching and laying.  In this context, the subcontracting price reasonableness analysis submitted by [Offeror B] is insufficient to satisfy the requirements of FAR § 15.404-3(b).  As with [Offeror A]'s proposal, the insufficiency of [Offeror B]'s compliance with this requirement in and of itself renders [Offeror B]'s proposal technically unacceptable, apart from [Offeror B]'s deficient showing that it would be able to comply with the limitations on subcontracting, although both failures are interrelated, and it was unreasonable for the Army to conclude otherwise without further inquiry.[20]

## C. Prejudice

To succeed on the merits, a bid protestor must show not only that there was an error in the procurement process but also that it was prejudiced by the error.  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  In this respect, a protestor must demonstrate that there was a "substantial chance it would have received the . . . contract award, but for the alleged error in the procurement process."  *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 712 (2013) (quoting *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003) (citing *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)));  *see also Alfa Laval*

---

[20]Because the court finds that both [Offeror A]'s and [Offeror B]'s proposals were not technically compliant for the reasons stated, the court need not address Hyperion's contention that both entities failed adequately to amend their proposals to agree to perform the work at the stated price regardless of the soil conditions actually encountered.  *See* Pl.'s Br. at 21-22.

*Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). This inquiry into "prejudice" is distinct from the inquiry into standing. While both use the "substantial chance" doctrine, prejudice at the jurisdictional threshold can be satisfied on the basis of the plaintiff's allegations, whereas prejudice on the merits can only be satisfied by the effect of an agency decision adjudged to be unlawful. *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010).

Hyperion has demonstrated that it was prejudiced by the Army's unreasonable determination that the other offerors' proposals facially complied with the limitation-on-subcontracting provision of the FAR. Additionally, the Army should not have found the proposals submitted by [Offeror A] and [Offeror B] to be technically acceptable when [Offeror A] failed entirely to comply with FAR § 15.404-3(b) and [Offeror B]'s attempted compliance only served to raise further questions regarding its subcontractor costs. If the Army had acted reasonably by inquiring into these shortcomings during discussions or by finding the final proposals technically unacceptable, Hyperion would have had a substantial chance of receiving the contract.

### D. Equitable Relief

Upon a finding that an agency's contract award was arbitrary and capricious, the court is guided by traditional equitable considerations in deciding whether to grant equitable relief by setting aside the improperly granted award. *See PGBA*, 389 F.3d at 1226-27. In making this determination the court should consider "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds the injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech*, 554 F.3d at 1037 (citing *PGBA*, 389 F.3d at 1228-29).

Looking at each factor in turn, Hyperion has succeeded on the merits by showing that the Army acted unreasonably in finding that TCSC, [Offeror A], and [Offeror B] all submitted technically acceptable proposals. Each of their proposals facially demonstrated a strong likelihood that the businesses would be unable to comply with the limitations on subcontracting. The Army should have inquired into their abilities to meet the self-performance requirement given how labor intensive the subcontracted in-country work would be and the overarching lack of detail in [Offeror A]'s and [Offeror B]'s proposals. The first factor weighs in favor of Hyperion.

The court has repeatedly held that the loss of potential work from a government contract can constitute irreparable harm. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 520 (2012) (citing cases). In this instance, denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute irreparable harm.

The court must balance the potential harm to Hyperion of not granting the injunction against the potential harm to the Army and to the awardee should the injunction be granted. *See PGBA*, 389 F.3d at 1231-32; *Gentex*, 58 Fed. Cl. at 654. TCSC would suffer an economic hardship if the contract award is rescinded, but if Hyperion is only awarded bid preparation

costs, it would suffer a corresponding hardship.  The government has not indicated any special consequence that would arise with terminating the contractual award and reevaluating the proposals or re-soliciting the contract.  There is no evidence that the installation must be undertaken immediately.  The government has not demonstrated that the balance of hardships should weigh in its favor.

The public has a strong interest in ensuring that the government procurement process is fair and even-handed.  *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219.  The government has presented no argument that the public has an exigent need for improved network capabilities in Jordan, or that the public will be harmed by a short delay while the Army responds to an order setting aside this contractual award to TCSC.

Considering all of the factors, the court finds that equitable relief is justified and that the Army's contractual award to TCSC should be set aside.  Despite Hyperion's urging, the court declines to provide any more specific instruction to the Army regarding its further actions in this procurement.

## CONCLUSION

For the reasons stated, Hyperion's motion for judgment on the administrative record is GRANTED IN PART.  The Army's contract with TCSC is set aside.  The government's motion to dismiss and cross-motion for judgment on the administrative record are accordingly DENIED.

The clerk is directed to issue a final judgment in accord with this disposition.

Costs are awarded to plaintiff.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge